# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Philip G. Reinhard | Sitting Judge if Other than Assigned Judge | P. Michael Mahoney |
|---|---|---|---|
| **CASE NUMBER** | 03 C 50300 | **DATE** | 7/14/2004 |
| **CASE TITLE** | | Jones vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated on the attached Report and Recommendation, it is the recommendation of the Magistrate Judge that the ALJ's decision to deny benefits to Plaintiff be sustained. The ALJ is affirmed at all steps of the disability determination process. Further, this court recommends that Plaintiff's Motion for Judgment on the Administrative Record and Pleadings be denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | | number of notices | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | 7-14-03 | 17 |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | 7/14/2004 | |
| | | date mailed notice | |
| sp | courtroom deputy's initials | sp | |
| | | mailing deputy initials | |

U. S. DISTRICT COURT

2004 JUL 14 AM 9:59

FILED-WD

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | | |
|---|---|---|
| **CARLENE E. JONES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **CASE NO. 03 C 50300** |
| | ) | |
| v. | ) | **Magistrate Judge** |
| | ) | **P. Michael Mahoney** |
| **JOANNE B. BARNHART,** | ) | |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Carlene E. Jones ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner"). *See* 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits ("DIB") pursuant to Title XVI of the Social Security Act (the "Act"). 42 U.S.C. § 1381(a). This matter is before the Magistrate Judge for Report and Recommendation pursuant to Rule 72(b) and 28 U.S.C. 636(b)(1)(B).

## I. BACKGROUND

Plaintiff filed for DIB on May 4, 2001. (Tr. 140). Plaintiff's application for benefits was denied on August 2, 2001. (Tr. 103). Plaintiff filed a request for reconsideration on August 8, 2001. (Tr. 107). Plaintiff's request for reconsideration was denied on March 1, 2002. (Tr. 109). Plaintiff then filed a request for a hearing before an Administrative Law Judge ("ALJ") on March 11, 2002. (Tr. 113). Plaintiff appeared, with counsel, before an ALJ on April 15, 2003. (Tr. 26). In a decision dated April 25, 2003, the ALJ found that Plaintiff was not entitled to DIB.

(Tr. 15). On May 1, 2003, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 8). On June 27, 2003, the Appeals Council denied Plaintiff's request for review. (Tr. 5).

## II. FACTS

Plaintiff was born on November 5, 1957, and was forty-five years old at the time of her April 15, 2003 hearing before the ALJ. (Tr. 76). Plaintiff completed her education through the eighth grade; she did not graduate from high school or receive her GED. (Tr. 33). At the time of the hearing, Plaintiff testified that she lived alone in an apartment. (Tr. 31). Plaintiff suffers from emphysema, asthma, high blood pressure, severe headaches, depression, and is HIV positive. For these reasons, and some others, Plaintiff claims to be disabled.

At the time of her hearing, Plaintiff's most recent employment was with a convalescent home.[1] Plaintiff testified that during the summer of 2001 she was an activities director at the convalescent home for about 30-45 days. (Tr. 38). This job was part-time: Plaintiff worked five hours per day, three days per week. (Tr. 38-39). As an activities director at this convalescent home, Plaintiff testified she was on her feet for about three hours of her five-hour shift. (Tr. 39). Additionally, Plaintiff pushed people in their wheelchairs and pushed game carts. (*Id.*). Plaintiff testified that she made herself take breaks while working, but would stand continuously for an average of one to two hours. (*Id.*).

Prior to working at the convalescent home, Plaintiff worked at Swiss Colony as a seasonal, third-shift assembly-line packer. (Tr. 41). This job was full-time: Plaintiff worked

---

[1]The record before this court does not provide specific information about the name and/or location of the convalescent home or the dates of employment.

eight hours per day, six days per week. (*Id.*). Her duties included packing cheeses into boxes to fill orders, and involved lifting or carrying about ten pounds. (Tr. 41-42). Plaintiff testified that she sustained a broken nose and injured her shoulders in an auto accident two weeks after beginning her employment with Swiss Colony. (Tr. 43). Plaintiff chose not to return to work following her auto accident because of her injuries and was subsequently terminated. (Tr. 42).

In 1999, for about a month, Plaintiff worked for a nursing home as a nurse's aide.[2] (Tr. 44). According to Plaintiff's testimony, her work included lifting patients.[3] (Tr. 44). Plaintiff stated she was "released" from this position because she was unable to lift patients, unable to stay awake during her shift, and was found sleeping during her shift. (*Id.*).

Prior to working as a nurse's aid, Plaintiff was employed for approximately one month at Anderson Packing in 1997.[4] (Tr. 45). Plaintiff's work involved packaging medications. (*Id.*). While working at Anderson Packing, Plaintiff lifted less than ten pounds, and performed her job sitting down. (*Id.*).

On a typical day, Plaintiff testified that she gets up, eats a light breakfast, and watches TV. (Tr. 46). Plaintiff stated that she does not sweep, mop, or vacuum for herself – her oldest daughter helps with these tasks. (*Id.*). Plaintiff is able to make her own bed, however, and does that daily. (*Id.*). From 10:00 a.m. until 1:00 p.m., Plaintiff usually sleeps. (Tr. 66). Despite her

---

[2]The record before this court does not provide specific information about the name and/or location of the nursing home or the dates of employment.

[3]The record before this court does not provide specific information about the nature of this "lifting" – it is unclear whether Plaintiff was lifting patients out of beds, recliners, or wheelchairs, or how much the patients weighed.

[4]The record before this court does not provide specific information about the date of employment, or the number of hours worked daily or weekly.

daily mid-day naps, Plaintiff told the ALJ that she always feels tired. (*Id.*). Plaintiff is able to do

some cooking; she will boil hot dogs or scramble eggs for herself. (Tr. 74). Plaintiff

occasionally will go to a store, and handles her own cash transactions at stores. (*Id.*). Plaintiff

does not, however, pay her own monthly bills because the Crusader Clinic, in Rockford, Illinois,

takes care of her bills for her. (*Id.*). Plaintiff testified that, as much as possible, she avoids

contact with others because she does not like people. (Tr. 45, 51, 60). Throughout the course of

a day, Plaintiff testified that she smokes up to two packs of cigarettes, but denied any use of

illegal drugs since 1997. (Tr. 54).

Vocational Expert, Christopher Yep, appeared before the ALJ during Plaintiff's hearing

on April 15, 2003. (Tr. 77). The vocational expert testified that Plaintiff's position at Swiss

Colony would be classified as an unskilled job requiring a light level of exertion and that

Plaintiff's position at Anderson Packaging would be classified as "an unskilled job performed at

a sedentary level of exertion." (Tr. 78, 79). With regard to the nurse's aid or activity director

positions, the vocational expert testified that those would both be semi-skilled positions

requiring a light level of exertion. (*Id.*).

The ALJ then presented the vocational expert with the following hypothetical situation:

> Let's assume we have a hypothetical female individual who's 45 years of age, has
> an eighth grade education with the ability to read, write and use basic numbers,
> has the same prior work history as the Claimant in this case with the capacity to
> perform work with the following and no other additional limitations. Lifting and
> carrying would be limited to up to a maximum of 20 pounds on an occasional
> basis and 10 pounds frequently. Sitting, standing and walking could be
> performed respectively and with normal breaks for up to six hours each within a
> normal day. Individual may not climb ladders, ropes or scaffolds but may
> otherwise climb ramps or stairs, balance, stoop, kneel, crouch and crawl on no
> more than an occasional basis. The individual must avoid concentrated exposure
> to fumes, odors, dust, gases and other pulmonary irritants. Must likewise avoid
> exposure to hazards such as exposed unprotected heights or excavations and also

exposed unprotected dangerous machinery. In terms of cognitive function let's say the individual would not have the capacity to focus upon or carry out complex or detailed tasks or to focus on or attend to or perform complex or detailed tasks at a sustained workman-like pace. I think I said before unable to carry out the complex or detailed instruction. The individual would however retain the capacity to focus on, attend to and carry out let's say simple instructions as well as to focus on, attend to and perform simple tasks at a sustained workman-like pace. Let's also indicate that the individual should not perform work which requires more than incidental contact with members of the general public. Looking at those limitations, in your opinion, would any of the prior work fit within the parameters of those limitations?

(Tr. 80). The vocational expert stated that such a hypothetical person could do work in hand packaging at a light level of exertion, and assembly and sorting occupations, at both the light and sedentary levels. (Tr. 81). The ALJ then added the following modifications to the hypothetical:

Lifting and carrying would be limited to a maximum of 10 pounds on an occasional basis and to lighter items such as small hand tools, individual case files on no more than a frequent basis, standing and walking would be limited to a combined total of two hours within an eight hour day, and let's say for no longer than about 15 minutes continuously at any one time.

(Tr. 83). With these changes to the hypothetical, the vocational expert determined that the individual would still be able to work in the sedentary assembly and sorting occupations. (*Id.*). According to the Vocational Expert, at the time of the hearing there were 26,198 sedentary assembly jobs and 9,783 sedentary sorting jobs in the regional economy. (Tr. 81-82).

## III. MEDICAL HISTORY

Plaintiff most often sought medical care at the Crusader Clinic in Rockford, Illinois, but also utilized the emergency departments at Rockford Memorial Hospital and SwedishAmerican Hospital when she felt care was needed more urgently. Plaintiff's medical history, as contained in her medical records, is difficult to decipher because Plaintiff did not routinely see the same practitioners and often failed to follow up with practitioners as recommended.

On January 7, 2000, Plaintiff was evaluated by Kersten Alschoewski, M.D., at the Crusader Clinic. (Tr. 230). At that time, Plaintiff complained of severe prurits[5] on her lower extremities and reported that she had lesions on her hands that had resolved. (*Id.*). Dr. Alschoewski's assessment of Plaintiff stated that Plaintiff had an allergy/skin rash and was HIV positive. (*Id.*). Dr. Alschoewski ordered numerous laboratory tests, and instructed Plaintiff to return in two to three weeks. (*Id.*). Numerous laboratory tests were conducted,[6] but there is no indication of follow-up with Dr. Alschoewski, or any other practitioner at the Crusader Clinic, within the recommended time frame. (*Id.*).

Plaintiff next saw Syed Ali, M.D., at the Crusader Clinic, on April 20, 2000, for a general physical evaluation – a "Social Security physical" according to Dr. Ali. (Tr. 268). At that time, Plaintiff complained of shortness of breath for one year with minimal exertion, being able to walk less than half a block or at the most one block before tiring and feeling short of breath, needing to be propped up all the time, and swelling of both feet which decreases at night. (*Id.*). She also complained of abdominal pain located in the upper abdomen with exacerbation upon eating spicy or greasy food, some nausea but no vomiting, and increased urination during the day. (*Id.*). Plaintiff reported that she smoked three packs of cigarettes a day for fifteen years but was down to one-half of a pack for the last year. (*Id.*). Plaintiff then continued to report that she had been eating a lot of greasy food and drinking about eight cans of pop every day. (*Id.*). Dr. Ali's assessment of Plaintiff noted that Plaintiff was HIV positive with a past history of prolonged drug abuse and cigarette smoking. (*Id.*). He wanted to rule out any congestive heart

---

[5]Itching. STEDMAN'S MEDICAL DICTIONARY 1449 (26th ed. 1995).

[6]Results from these tests may be found on pages 231-243 of the transcript, in no apparent order.

failure which could be related to cardiomyopathy[7] secondary to drugs or secondary to coronary artery disease, and rule out diabetes and/or peptic ulcer disease. (*Id.*). Dr. Ali ordered several laboratory tests and advised Plaintiff to restrict her total fluid intake and increase the fiber content of her diet. (*Id.*). He also provided Plaintiff with an albuterol inhaler for her asthma. (*Id.*).

Plaintiff followed up with Dr. Ali on April 25, 2000. (Tr. 267). At that time, Dr. Ali noted that Plaintiff's laboratory results were unremarkable. (*Id.*). Because Plaintiff continued to experience shortness of breath and coughing, Dr. Ali ordered chest x-rays and pulmonary function tests ("PFTs"), and advised Plaintiff to continue with her albuterol inhaler as needed. (*Id.*). Plaintiff was instructed to follow up with Dr. Ali following her x-rays and PFTs. (*Id.*).

Plaintiff next sought follow-up care with Dr. Ali on May 10, 2000. (Tr. 252). Dr. Ali noted that the PFTs showed that Plaintiff had an obstructive disease which improved with bronchodilator therapy. (*Id.*). Dr. Ali also noted that upon speaking with Plaintiff further, and looking at her chart more closely, he became aware of Plaintiff's history of chronic asthma and prior treatment with albuterol, theophylline, and vanceril in the past – history which was not given to Dr. Ali when Plaintiff was previously seen. (*Id.*). Dr. Ali's frustration with the situation is apparent by his comments that Plaintiff "underwent a lot of work up for evaluation of shortness of breath" and that she "continues to smoke up to three packs a day." (*Id.*). Dr. Ali determined Plaintiff has asthma exacerbation and bronchitis. (*Id.*). Plaintiff was treated with antibiotics and prednisone, and advised to stop smoking. (*Id.*).

Plaintiff's next medical treatment occurred at the Emergency Department of Rockford Memorial Hospital. (Tr. 260). Plaintiff was seen by George Tsonis, M.D., for chief complaints

---

[7]Disease of the myocardium. STEDMAN'S MEDICAL DICTIONARY 282 (26th ed. 1995).

of headache and dizziness on August 28, 2000. (*Id.*). While at Rockford Memorial Hospital, Plaintiff was treated with intravenous medication for relief of her headache. (*Id.*). A head CT was ordered and read as normal. (Tr. 261). The etiology of Plaintiff's headache was undetermined and could not be studied further because Plaintiff left the Emergency Department prior to being formally discharged. (*Id.*).

On September 5, 2000, Plaintiff was seen at the Emergency Room of SwedishAmerican Hospital for complaints of shortness of breath persisting for four days. (Tr. 295).[8] The record for this visit states that Plaintiff achieved "complete resolution of bronchospasms" and was "feeling fine" after treatments. (*Id.*). Chest x-rays were taken, and Plaintiff was discharged. (*Id.*). Plaintiff was diagnosed with acute exacerbation of asthma, given an inhaler and placed on prednisone, and instructed to follow-up with Crusader Clinic if symptoms recurred or new problems developed. (*Id.*).

Plaintiff was next seen at the Emergency Room of SwedishAmerican Hospital following a motor vehicle accident on December 1, 2000. (Tr. 300). Plaintiff chiefly complained of pain in her neck and nose. (*Id.*). She reported loss of consciousness, and stated that she did not strike her head during the accident. (*Id.*). Plaintiff was diagnosed with a cervical strain and nasal contusion, and instructed to follow up with her doctor. (*Id.*).

On January 13, 2001, Plaintiff visited the Emergency Room of SwedishAmerican Hospital for abdominal pain and shortness of breath. (Tr. 293).[9] During this visit, Plaintiff was

---

[8]For some reason, two copies of the full Emergency Room Report for this visit can be found on pages 295-296 and 302-303 of the transcript.

[9]Two copies of this full Emergency Room Report can be found on pages 293-294 and 298-299 of the transcript. Additionally, the first page of another Emergency Department Medical Record for this visit, containing identical information, can be found on page 322.

diagnosed with acute cholecystitis,[10] cholelithiasis,[11] and severe pain. (*Id*.). Plaintiff was admitted for, and underwent, a laparoscopic cholecystectomy.[12] (*Id*.). On January 16, 2001, Plaintiff was discharged to home. (Tr. 315). Plaintiff's Discharge Summary for this hospitalization states that she tolerated the surgical procedure well and her vitals remained stable throughout her hospitalization. (*Id*.). She was given an appointment with general surgery in two week's time and also an appointment with her primary doctor. (Tr. 315). Plaintiff's discharge medications included inhalers for asthma and antibiotics and prednisone. (*Id*.).

Almost six months later, on July 10, 2001, Plaintiff was seen for examination by Eamlesh Ramchandani, M.D., for complaints of headaches which had persisted for six months. (Tr. 326). Plaintiff reported that she experienced dull, aching, continuous headaches in the frontal region with some relief on taking aspirin or laying in a quiet room. (*Id*.). Plaintiff's headaches were associated with dizziness, photophobia, and nausea. (*Id*.). Plaintiff also related her difficulty with asthma and emphysema, dyspnea on exertion, and backaches to Dr. Ramchandani. (*Id*.). At that time, Plaintiff reported that she was smoking two packs of cigarettes per day. (Tr. 327). Notes of Dr. Ramchandani's physical exam reveal that Plaintiff was, at that time, in no acute physical distress. (*Id*.). Dr. Ramchandani noted that Plaintiff's

> gait is normal unassisted. She is able to walk on the heels and toes gingerly. She is able to squat partially and get up from partially squatting position with support. She is able to get on and off the examination table with minimal assistance. She is able to dress and undress herself without assistance.

---

[10]Inflammation of the gall bladder. STEDMAN'S MEDICAL DICTIONARY 328 (26th ed. 1995).

[11]Presence of concretions in the gallbladder or bile ducts. STEDMAN'S MEDICAL DICTIONARY 329 (26th ed. 1995).

[12]Surgical removal of the gallbladder. STEDMAN'S MEDICAL DICTIONARY 327 (26th ed. 1995).

(*Id.*).  Dr Ramchandani conducted PFTs, and finally diagnosed Plaintiff as suffering from (1) tension headaches, (2) lumbar arthralgia, (3) chronic obstructive pulmonary disease, (4) hypertension, uncontrolled, and (5) HIV disease with morbid obesity.  (Tr. 328)  Before concluding the report, Dr. Ramchandani added: "Please note patient did not become short of breath on doing any of the above mentioned activities during the examination." (*Id.*).

Plaintiff underwent a psychological assessment on January 25, 2002, by Mark B. Langgut, Ph.D.  (Tr. 335).  The medical information contained in the assessment states that Plaintiff suffered from obesity, hepatitis C, hypertension, asthma, and sleep apnea, in addition to being HIV positive and in the first stage of emphysema.  (Tr. 336).  Plaintiff had reportedly never engaged in mental health treatment.  (*Id.*).  At the time, Plaintiff was still smoking two packs of cigarettes per day.  (Tr. 337).  Dr. Langgut's notes state that Plaintiff's gait was unimpaired both on casual observation and by report.  (*Id.*).  After extensive evaluation, Dr. Langgut diagnosed Plaintiff with a dysthmic disorder,[13] polysubstance abuse – in remission, personality disorder, not otherwise specified, and noted Plaintiff was a victim of sexual abuse as a child. (Tr. 339).

Plaintiff's next medical record before this court indicates a visit to the Crusader Clinic on July 30, 2002.  (Tr. 344).  At that time, Plaintiff was evaluated by Ernest Kamara, M.D., for a follow-up evaluation.[14]  (*Id.*).  At that time, Plaintiff was complaining of increased urination and

---

[13]A chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by some of the following symptoms: poor appetite or over-eating, insomnia or hypersomnia, low energy or fatigue, low self-esteem, poor concentration, difficulty making decisions, and feelings of hopelessness.  STEDMAN'S MEDICAL DICTIONARY 536 (26th ed. 1995).

[14]This medical record indicates that Plaintiff was seen at Crusader Clinic on May 21, 2002, and sometime in March, 2002, although copies of medical records verifying treatment or evaluation on these dates are not found within the transcript.

burning urination. (*Id.*). Plaintiff denied any nausea or vomiting, diarrhea or constipation. (*Id.*).
Dr. Kamara's assessment noted that plaintiff was (1) HIV positive, (2) had a urinary tract
infection, (3) suffered from high blood pressure, (4) depression, and (5) allergic reaction/contact
dermatitis. (*Id.*). With regard to Plaintiff's HIV, the assessment notes clearly sate, "We'll hold
off on continued therapy due to recurrent drug use." (*Id.*). With regard to Plaintiff's depression,
the assessment notes clearly state, "[Patient] was to have been seen by psychiatry. She hasn't
followed up. . ." (Tr. 345). While there is some discrepancy in this medical record about
whether Plaintiff had last been seen in May or March, it is clear that she did not follow up with
psychiatric practitioners in a timely manner. (Tr. 344-345). Plaintiff was provided with
prescriptions to treat her remaining ailments, and was instructed to return for follow-up
evaluation in two weeks. (*Id.*).

On August 22, 2002, Plaintiff was again seen at the Crusader Clinic by Dr. Kamara. (Tr.
342). At that time, Plaintiff's only complaints were of left-sided breast tenderness, generalized
headache, and elevated blood pressure. (*Id.*). Dr. Kamara's assessment and plan noted that
Plaintiff was HIV positive, suffering from a headache, and had hypertension. (*Id.*). Medications
were prescribed as Dr. Kamara saw fit, and Plaintiff was instructed to return for follow-up
evaluation in two weeks. (Tr. 342-343).

More than a month later, Dr. Kamara saw Plaintiff at Crusader Clinic on September 26,
2002. (Tr. 395). Plaintiff's complaints at that time included difficulty sleeping, difficulty
breathing on occasion, and shortness of breath. (*Id.*). Plaintiff stated that she was smoking three
packs of cigarettes per day at that time, and denied any fevers, chills, nausea, vomiting, diarrhea,
or constipation. (*Id.*). Plaintiff was assessed as suffering from sinusitis, chronic headaches, and

tinea corporis[15] in addition to being HIV positive. (Tr. 395-396). Again, medications were prescribed as Dr. Kamara saw fit, and Plaintiff was instructed to follow-up in four weeks. (*Id.*).

Plaintiff's next appointment at Crusader Clinic was with Lynn Yontz, N.P., on October 28, 2002. (Tr. 393).[16] Plaintiff complained to Ms. Yontz of a persistent headache and some increased blurred vision. (*Id.*). Ms. Yontz's initial impression was that Plaintiff had a sinus infection, but she expressed concern about other opportunistic infections since Plaintiff was not on any medication for her HIV. (*Id.*). Plaintiff's headache was treated with an injection in the office, and after several minutes and a brief vagovasal response, Plaintiff was feeling much better. (*Id.*). Ms. Yontz's final impression noted that Plaintiff had HIV disease. (*Id.*). Plaintiff was treated with prescription medications and instructed to follow-up in two days. (*Id.*). Plaintiff was also cautioned that if her headache failed to improve she should seek emergency care.

Plaintiff sought follow-up care ten days later on November 7, 2002, with regard to her headache. (Tr. 392). Per the medical record for this visit, Plaintiff was admitted to SwedishAmerican Hospital to rule out possible meningitis.[17] (*Id.*). Plaintiff's MRI report indicates (1) deep white matter changes most likely representing HIV encephalopathy or

---

[15]A well-defined, scaling, macular eruption of dermatophytosis that frequently forms annular lesions and may appear on any part of the body. STEDMAN'S MEDICAL DICTIONARY 1815 (26th ed. 1995).

[16]A second copy of the medical record for this visit is also found on page 394 of the transcript.

[17]A record of this admission to SwedishAmerican Hospital for this date is not found within the transcript.

kneeling, crouching, or crawling, but should never engage in balancing. (Tr. 349). Dr. Kudirka's assessment noted no manipulative, visual, or communicative limitations. (Tr. 349-350). With regard to environmental limitations, Dr. Kudirka's assessment reported that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and hazards (such as machinery, heights, etc.). (Tr. 350). Dr. Kudirka's assessment also noted that there is not a treating or examining source statement regarding Plaintiff's physical capacities in the medical file. (Tr. 351). Further, in the "additional comments" section, Dr. Kudirka clearly stated:

> Claimant has a history of asthma, lumbar arthralgia, HBP, headaches, and she is HIV positive. She does not require frequent hospitalizations or ER visits for treatment of her asthma or other illnesses. PFT's are within normal limits. She is 66.5 inches tall and weighs 325 pounds. She has somewhat limited range of motion in the lumbar spine on current physical examination. X-ray of the lumbar spine shows scattered endplate spurring. Her gait is normal, unassisted. There is no evidence of swelling or redness. 01/01 records indicate that her HIV was well-suppressed. She is not currently receiving ongoing treatment for this condition and does not have any opportunistic infections related to this disease. Despite her condition, she should be capable of performing light work activities with the additional restrictions mentioned above.

(Tr. 352). A second DDS physician, T. Arjmand, M.D., reviewed and affirmed this assessment on February 22, 2002. (Tr. 347).

## IV. STANDARD OF REVIEW

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however, is not *de novo*; the court "may not decide the facts anew, re-weigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citations omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "where conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *also see Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimum articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of a witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989); *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994); *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V. **FRAMEWORK FOR DECISION**

The Commissioner has established a sequential five-step process to evaluate disability claims. 20 C.F.R. § 404.1520 (2003). If disability or lack of disability is determined at any step in the process, the evaluation ends. 20 C.F.R. § 404.1520(a). The Commissioner begins by asking whether a claimant is presently engaged in employment that qualifies as substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(b). If the answer is yes, the claimant is deemed not disabled. *Id.* If the answer is no, the Commissioner next asks whether the claimant has any impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). If the answer is no, the claimant is found to be not disabled. *Id.* If the answer is yes, the Commissioner then determines whether the claimant's impairments meets or equals a listed impairment. 20 C.F.R. § 404.1520(d). If the answer is yes, the Commissioner will find that the claimant is disabled. *Id.* If the answer is no, the Commissioner then inquires whether the claimant's impairments prevent him from doing past relevant work. 20 C.F.R. § 404.1520(e). If the answer is no, the claimant is not disabled. *Id.* If the answer is yes, the Commission finally asks whether the claimant's impairments prevent him from doing any other work. 20 C.F.R. § 404.1520(f). If the answer is yes, a determination of disability is made. If the answer is no, the claimant is determined not to be disabled. *Id.* Plaintiff bears the burden proof in steps one through four. *Young v. Sec'y of Health & Human Services*, 957 F.2d 386, 389 (1992). At step five, the burden shifts to the Commissioner. *Id.*

## VI. **ANALYSIS**

The court will proceed through the five step analysis in order.

**A. Step One: Is the claimant currently engaged in substantial gainful activity?**

The ALJ found no evidence of work after the Plaintiff's application date. (Tr. 16). Neither party disputes this first determination by the ALJ, and there is substantial evidence to support the determination of the ALJ.

**B. Step Two: Does the claimant suffer from a severe impairment?**

The ALJ then considered whether Plaintiff suffered from a severe impairment. (Tr. 16). A severe impairment exists where an impairment or combination of impairments significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The ALJ determined that Plaintiff possessed a severe impairment. (*Id.*). Specifically, the ALJ found the Plaintiff to "[have] the following medically determinable impairments: asthma, chronic obstructive pulmonary disease, HIV+, hypertension, degenerative disease of the lumbar spine, tension and/or migraine headaches, depression, post traumatic stress disorder, polystubstance dependence (in remission) and obesity." (Tr. 23-24). Neither party challenges this second determination, and there is substantial evidence to support the determination of the ALJ.

**C. Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?**

The ALJ next evaluated the severity of Plaintiff's mental impairment in terms of four broad functional areas: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. (Tr. 16). The ALJ determined that Plaintiff exhibited a mild limitation in activities of daily living, and a moderate limitation in social functioning and maintaining concentration, persistence and pace. (Tr. 17). The ALJ noted that the Plaintiff exhibited one or two episodes of decompensation. (*Id.*). The ALJ determined that Plaintiff's

possibly CMV, and (2) parasinus disease. (Tr. 389).[18] Plaintiff's CT report indicates the presence of mucosal thickening of the left maxillary sinus, with no intracranial bleed. (Tr. 390).

Plaintiff's next appointment at the Crusader Clinic, on November 15, 2002, was with a social worker, Bridget Reddy. (Tr. 403). Plaintiff was apparently referred for counseling and a psychiatric consultation. (*Id.*). Ms. Reddy notes that Plaintiff clearly has depressive symptomology, and scheduled Plaintiff for a follow up visit with Dr. Rizvi. (*Id.*). Plaintiff did not keep her November 21, 2002 appointment with Dr. Rizvi, and was next seen at the Crusader Clinic on December 9, 2002. (*Id.*). The hand-written notes from this visit indicate that Plaintiff was following up with concerns about headaches, rectal bleeding, short term memory loss, and a rash on her breast. (*Id.*). Notes indicate that Plaintiff was a smoker and had depression.(*Id.*). Plaintiff was treated for a rash and hemorrhoids, and was directed to follow-up with Dr. Rizvi. (*Id.*).

On July 26, 2001, George Kudirka, M.D., with the Illinois Disability Determination Services ("DDS"), completed a physical residual functioning capacity ("RFC") assessment for Plaintiff based on all the evidence in Plaintiff's file. (Tr. 347). After reviewing Plaintiff's clinical and laboratory findings, symptoms, observations, lay evidence, and reports of daily activities, etc., Dr. Kudirka concluded that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand or walk with normal breaks for about six hours in an eight-hour workday, sit with normal breaks for six hours in an eight-hour workday, and push or pull for unlimited periods of time with the lift and carry weight limitations. (Tr. 348). Dr. Kudirka also concluded that Plaintiff could occasionally engage in climbing, stooping,

---

[18]A Medical Imaging report containing identical information can also be found on page 391 of the transcript.

limitations and infrequent episodes of decompensation did not meet the level of severity required under section 12.04, 12.06, 12.08 and/or 12.09. (*Id.*).

The ALJ then considered whether Plaintiff's physical impairments met or equaled any impairment listed in Appendix 1 to Subpart P, Regulations No. 4. (Tr. 16). The ALJ determined that Plaintiff's impairments did not meet or equal any listed impairment. (*Id.*). The ALJ, very thoroughly, stated:

> No listing provision is met or equaled including sections 3.02/03 (Asthma/COPD)(which require an FEV1 of 1.45 and/or an FVC of 1.65 or less at claimant's reported height of 68 inches; similarly the record does not disclose the requisite number of treatment interventions for asthma); section 12.04 or 12.06 (re: Depression and PTSD); or section 14.08 (including section 14.08HI, regarding HIV encephalopathy, characterized by cognitive or motor dysfunction, which limits function and progress. No such dysfunction is evident of record).

(Tr. 16). This thorough analysis by the ALJ allows the court to follow the ALJ's reasoning and proceed without question to the next step of the disability determination process. Substantial evidence exists to support the ALJ's determination at this step, and the court finds no reason to disturb it.

## D. Step Four: Is the claimant capable of performing work which the claimant performed in the past?

Before reaching the step-four analysis, the ALJ established Plaintiff's RFC. (Tr. 17). The RFC is what the Plaintiff can still do despite her limitations. See 20 C.F.R. §416.945. The ALJ considered Plaintiff's allegations of disabling symptoms and limitations and the entire record. (*Id.*). The ALJ found Plaintiff's claims of total disability not credible. (Tr. 16). The ALJ determined that

> Plaintiff's medically determinable impairments preclude the following work-related activities: lifting/carrying up to 10 pounds more than occasionally, or lighter items such as small hand tools, individual case files more than frequently; stand/walk or more than a combined total of 2 hours in an 8 hour day or for

longer than 15 minutes, continuously; sit, with normal breaks for more than 6 hours in an 8 hour day but must be allowed to alternate from sitting to standing position at intervals of (1) hour for a period of 1 to 2 minutes on each such occasion, may not perform overhead work more than occasionally; climbing ropes, ladders, or scaffolds; climbing ramps or stairs, balancing, stooping, crouching, kneeling or crawling more than occasionally; performing jobs in environments containing any respiratory irritant(s) in concentrated levels; performing work around exposed unprotected heights or excavations; or performing work with or near exposed-unprotected dangerous moving machinery; focusing upon, attending to and carrying out complex instructions; focusing upon, attending to or carrying out complex or detailed tasks at a sustained, workmanlike pace; and performing work which requires more than incidental contact with members of the general public. However, the claimant retains the capacity to focus upon, attend to and carry out simple instructions and to focus upon, attend to and perform simple tasks at a sustained workmanlike pace.

(Tr. 17). The ALJ determined that Plaintiff's medical records did not indicate the "type of medical treatment one would expect for a totally disabled individual." (Tr. 22). Further, the ALJ determined that Plaintiff's medical records revealed treatment was "generally successful in controlling those [disabling] symptoms" Plaintiff claimed to suffer from. (Id.). The ALJ went on to state that "the description of the symptoms and limitations which the claimant has provided throughout the record [have] not generally been . . . wholly consistent with the concurrent medical record. The record similarly does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." (Id.). The ALJ determined that Plaintiff, while limited in some respects, "retained the capacity to focus upon, attend to and carry out simple instructions and to focus upon, attend to and perform simple tasks at a sustained workmanlike pace." (Tr. 17).

The ALJ then performed the step-four analysis to determine whether Plaintiff's severe impairments prevented Plaintiff from engaging in past relevant work. (Tr. 22). Past relevant work is SGA that the claimant performed within the previous fifteen years and that the claimant performed for a period of time sufficient to learn how to do the work. 20 C.F.R. §§ 404.1520(e),

19

404.1560(b)(1). The ALJ determined that Plaintiff could not "perform any past relevant work, since even the [Plaintiff's] least demanding past relevant job required her to perform work activities inconsistent with the residual functional capacity determined above." (Tr. 22-23).

The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding.

## E. Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five, the ALJ determined that although Plaintiff's RFC did not allow her to perform the full range of sedentary work, there existed a significant number of jobs in the regional economy that she can perform. (Tr. 23). To make his determination, the ALJ consulted vocational expert Christopher Yep, who determined that Plaintiff could still perform sedentary work in assembly and sorting occupations. (Tr. 80). According to the ALJ, and

> in view of the claimant's vocational characteristics and the [RFC] reported above, two Medical-Vocational rules are relevant. For the period preceding November 5, 2002, Medical-Vocational rule 201.24 serves as a framework and indicates a finding of "not disabled." For the period of time from Nobemver 5, 2002 to [April 25, 2003], rule 201.18 serves as a framework and also indicates a finding of "not disabled." Although the claimant's limitations prevent the performance of the full range of work at the sedentary level, the impact of the limitations on the sedentary occupational base is only slight, and there still remains a significant number of jobs in the economy that the claimant can perform.

(Tr. 23). Additionally, the ALJ stated that

> The [Plaintiff] has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. She is able to do light housekeeping chores, cooking and shopping. Her daughter helps her with tasks that require sustained effort and exertion. She is very wary of people and she mistrusts men. The [Plaintiff] has not generally received the type of medical treatment one would expect for a totally disabled individual. Although the [Plaintiff] has received various forms of treatment for the allegedly disabling symptoms, which would normally weigh somewhat in the [Plaintiff's] favor, the record also reveals that the treatment has been generally successful in controlling those symptoms. The claimant cancelled or failed to show up for doctor

appointments on a number of occasions. The record reveals that the [Plaintiff] failed to follow-up on recommendations made by the treating doctor, which suggests that the symptoms may not have been as serious as has been alleged in connection with this application and appeal. The [Plaintiff's] use of medications does not suggest the presence of an impairment(s) which is more limiting than found in this decision. A review of the [Plaintiff's] work history shows that the claimant worked only sporadically prior to the alleged disability onset date. The description of the symptoms and limitations which the claimant has provided throughout the record has not generally been (as discussed above) wholly consistent with the concurrent medical record. ***The record similarly does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision.*** The residual functional capacity conclusions reached by the physicians employed by the State Disability Determination Services also supported a finding of 'not disabled.' Although those physicians were non-examining, and therefore their opinions do not as a general matter deserve as much weight as those of examining or treating physicians, those opinions do deserve some weight, particularly in a case like this in which there exists a number of other reasons to reach similar conclusions (as explained throughout this decision).

(Tr. 22)(emphasis added).

After reviewing Plaintiff's medical record and the ALJ's opinion, this court finds substantial evidence to support the ALJ. As the ALJ pointed out in his opinion, "The objective findings in this case fail to provide strong support for the [Plaintiff's] allegations of disabling symptoms and limitations." (Tr. 19). There does not appear to be any conflict between Plaintiff's treating physicians and other non-treating physicians. No treating practitioners indicate in Plaintiff's medical records that she is disabled. There is no indication from either a treating or non-treating physician that the RFC determined by the ALJ is incorrect, and the medical record supports the RFC. Accordingly, because substantial evidence exists to support the ALJ's finding, the court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII. CONCLUSION

For the foregoing reasons, it is the Report and Recommendation of the Magistrate Judge the ALJ's decision to deny benefits to Plaintiff be sustained. The ALJ is affirmed at all steps of the disability determination process as outlined above. Further, this court recommends that Plaintiff's Motion for Judgment on the Administrative Record and Pleadings be denied.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 7/14/04